IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case No.: 3:19-cv-282-FDW-DSC

**LEWIS CORPENING,** *individually and on*
*behalf of persons similarly situated,*

        **Plaintiff,**

    **v.**

**MONEYLION INC., MONEYLION OF**
**NORTH CAROLINA LLC, and ML PLUS**
**LLC, and ML WEALTH LLC,**

        **Defendants.**

## AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.    Defendants offer financial services, including loans that violate North Carolina usury law, through an online portal accessed via an app called MoneyLion. These loans are made by MoneyLion of North Carolina, and are only made if the borrower becomes a MoneyLion "member," and signs a "Membership Agreement" made by affiliate ML Plus, LLC.

2.    MoneyLion touts itself as "the financial operating system revolutionizing the way Americans save, invest, borrow, and build their credit."

https://blog.moneylion.com/moneylion-appoints-jon-stevenson-as-new-head-of-wealth-management-and-banking/

3.    But for consumers like Plaintiff Lewis Corpening, MoneyLion's purported 5.99% APR ML Plus loan represents a deceptive and usurious loan with a

real interest rate of approximately 121.5% when all required payments are taken into account, well above the North Carolina interest rate ceiling.

4.     Mr. Corpening's MoneyLion Plus loan is the functional equivalent of a payday loan, as ML Plus loans are underwritten based upon the requisite regular paycheck, are auto-debited from the consumer's bank account, are made at interest rates of approximately 121.5% when properly calculated with all required payments are taken into account, well above the 16% rate ceiling (although misrepresented as being at 5.99%).

5.     The 16% rate ceiling applies because MoneyLion of North Carolina is not licensed to make loans to North Carolina residents.

6.     North Carolina law makes unlicensed loans void at inception. N.C. Gen. Stat. §§ 53-166(a) and (d), 53-168(a), 53-176.

7.     North Carolina law also makes payday loans illegal, as has been the case since 2001 when the law allowing payday loans was allowed to expire.

8.     Mr. Corpening's loan violates three North Carolina statutes, the Consumer Finance Act, the Debt Collection Act, and the Unfair & Deceptive Trade Practices Act. This loan constitutes an unconscionable and deceptive lending practice.

9.     Mr. Corpening brings this lawsuit on behalf of a class of North Carolinians who fell victim to the Defendants' (hereinafter collectively "MoneyLion" except as the context otherwise requires) deceptive and unconscionable ML Plus loan product.

10.     Mr. Corpening and the proposed Class seek relief for violations of the

North Carolina Consumer Finance Act, North Carolina usury laws, Unfair and Deceptive Practices Act, state and federal debt and agency collection laws, the federal Truth in Lending Act, and unjust enrichment.

## JURISDICTION AND VENUE

11.     Plaintiff originally filed this suit in state court on May 10, 2019. North Carolina state court had original jurisdiction over this action under N.C. Gen. Stat. § 7A-240. Defendants later removed the case to this Court

## PARTIES

12.     Plaintiff Lewis Corpening is a natural person and resident of Mecklenberg County, North Carolina.

13.     Defendant, MoneyLion, Inc., is a Delaware corporation with its principal place of business located, upon information and belief, at 30 W. 21st St., Fir. 9, New York City, NY 10010.

14.     MoneyLion, Inc. is the parent company and sole member of Defendants MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC, and, upon information and belief, directs and manages the operations of Defendants, MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC.

15.     Defendant, MoneyLion of North Carolina, LLC is a Delaware corporation with its principal place of business located at 30 W. 21st St., Fir. 9, New York City, NY 10010.

16.     Defendant, ML Plus, LLC ("ML Plus"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Fir. 9, New York City, NY 10010.

17.     ML Plus is the MoneyLion subsidiary that operates the MoneyLion Plus membership program.

18.     Defendant, ML Wealth, LLC ("ML Wealth"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010.

19.     ML Wealth is a registered investment advisor with the Securities and Exchange Commission. ML Wealth manages the assets held in Plaintiff's MoneyLion Investment Account.

20.     All Defendants work in concert to operate the MoneyLion App and MoneyLion website related services and to execute the scheme this Complaint describes.

## ALLEGATIONS SPECIFIC TO MR. CORPENING

**A.     The MoneyLion Account and Loan**

21.     When Mr. Corpening created his MoneyLion account he did not affirmatively consent to any specific terms and conditions, and certainly was not aware that his creation of the account would result in an alleged waiver of any claim in court, right to bring a class action, or any other limitation of liability discussed herein. The application process did not require Mr. Corpening or other customers to access any particular terms and conditions, read them, or affirmatively assent to them in order to create an account.

22.     In the membership process, MoneyLion opaquely refers to its "E-sign disclosure" without explicitly requiring its customers, like Mr. Corpening, to assent to

the terms, including any limitation of liability, class action waiver, or waiver of right to bring an action in court.

23.     To the extent that important terms like an arbitration clause existed, those terms were not conspicuously presented or displayed to Mr. Corpening in the application process on MoneyLion's website and app such that Mr. Corpening knew or should have known and understood the rights he was allegedly waiving by creating a MoneyLion account.

24.     The terms and conditions and contracts therein are buried within background pages on MoneyLion's website or in the background of its app.  Mr. Corpening's "E-signature" allegedly produced on any contract with MoneyLion does not represent his assent to the terms contained therein.

25.     In creating his application, Mr. Corpening did not understand he was allegedly agreeing to waive his right to bring an action in court, participate in a class action, or limit MoneyLion's liability when he created a MoneyLion account online.

26.     On May 13, 2018, Mr. Corpening took out a $500 MoneyLion Plus loan. MoneyLion of North Carolina is the identified lender.

27.     The loan has a one-year term, payable in weekly installments of $9.91.

28.     As a condition of getting the loan, Mr. Corpening had to pay an additional $79 per month for his MoneyLion membership fee ($29 monthly) and for mandated deposits to his "investment account" ($50 monthly).

29.     Mr. Corpening made weekly payments until his financial situation no longer allowed him to make these payments, which totaled approximately $121.61.

30.     Along with this loan, Defendants gave Mr. Corpening a TILA Disclosure Statement that identified Defendants as the lender and as the entities that produced the loan.

**B.     Defendants' Lending Practices Violate North Carolina Laws**

31.     At the time that MoneyLion made its loans to Mr. Corpening and the Class, Defendants were aware that North Carolina law prohibits unlicensed lenders from making loans of $25,000 or less, at interest rates exceeding 16 percent per annum, and prohibits licensed lenders with the Commissioner of Banks from making consumer loans up to $15,000 at 30 percent per annum. N.C. Gen. Stat. §§ 24-1.1, 53-176.

32.     The consumer loan interest statutes were enacted in North Carolina as a matter of "paramount public policy" to "protect North Carolina resident borrowers." N.C. Gen. Stat. § 24-2.1.

33.     At the time that MoneyLion made its loans to Mr. Corpening and the Class, Defendants were aware that any loan made to North Carolina borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest or any charges whatsoever with respect to the loan. N.C. Gen. Stat. §§ 53-166(a) and (d), 53-168(a), 53-176.

34.     MoneyLion of North Carolina does not have a license from the Commissioner of Banks permitting it to make loans to North Carolina borrowers, such as Plaintiff and the Class.

35.     Upon information and belief, MoneyLion of North Carolina has never

had a consumer finance license permitting it to make loans to North Carolina borrowers.

36.     Accordingly, MoneyLion's loans to North Carolina residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to attempt to collect or collect any principal or interest on the loans.

37.     At the time that MoneyLion made its loans to Mr. Corpening and the Class, Defendants were aware that North Carolina law prohibits usurious rates on the loans, as defined in N.C. Gen. Stat. §§ 24-1.1, 53-176, and that their lending practices were at interest rates constituting usury.

38.     Through advertising, marketing, and contracting, MoneyLion targeted North Carolina consumers as part of its lending practices, including the loan to Mr. Corpening.

39.     MoneyLion chose North Carolina as a place where loans and collection efforts would ensue and participated in and knew of the actions of the other Defendants in North Carolina.

**C.     Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable**

40.     Because the loans were made and collected without a North Carolina consumer finance license, the MoneyLion loan agreements are void and unenforceable.

41.     Because the loans carried an interest rate of approximately 121.5% when properly calculated, in excess of the maximum rate permitted under North Carolina law, whether licensed or not, the MoneyLion loan agreements are void and unenforceable.

42.     The MoneyLion agreements not only violate North Carolina's consumer lending statutes and the public policy against usurious loans, but also contain unconscionable and unenforceable choice of law and arbitration provisions that seek to disclaim North Carolina consumer protection laws and legal rights and ultimately deprive consumers of their day in court.

43.     MoneyLion's Terms of Use contain several grossly one-sided provisions, which purport to contract away certain legal obligations it owes borrowers, while reserving to itself a number of draconian measures it can impose on borrowers, and which it can invoke with virtually unfettered discretion.

## Unfettered Discretion To Alter The Contract

44.     MoneyLion's Membership Program and Services Agreement Terms and Conditions are illusory, in that this contract allows it to change material terms at its sole discretion. For example, with respect to the services provided in consideration for the MoneyLion membership fee, MoneyLion states:

> Company does not guarantee that each of these Services will always be offered to You, that they will be available to You, or that You will qualify or be able to utilize any particular Service. Services will change from time to time and certain Services may be discontinued or others may be added.

> The features available through the Site or App may change from time to time, in the sole discretion of the Bank or Company.

45.     These Membership Terms purport to give it unfettered discretion to unilaterally change its agreement:

> **Changes to Membership, Membership Agreement, Program and** Service **Terms.** WE RESERVE THE RIGHT IN

OUR SOLE DISCRETION TO ADD, REMOVE, CHANGE, OR UPDATE PROVISIONS OF THIS MEMBERSHIP AGREEMENT, PROGRAM AND SERVICES AT ANY TIME BY POSTING THESE CHANGES ON OUR SITE, APP OR BY SENDING YOU THE CHANGES BY EMAIL. BY CONTINUING TO USE THE MEMBERSHIP, PROGRAM AND SERVICES, YOU AGREE TO SUCH CHANGES. IF YOU DO NOT AGREE WITH ANY OF THE CHANGES TO THE TERMS OF SERVICE, YOU MUST STOP USING THE PROGRAM OR SERVICE.

46. But if a borrower does not agree to the terms and tries to "stop using the program or service" he or she would run afoul of this provision:

> Withdrawals for Plus Program members will not be processed if doing so would result in Your Investment Account retaining a value of less than $150 (the "Minimum Balance"). For Plus Program members, the remaining $150 may be withdrawn only upon account termination; and If You are a Plus Program member and if You have pledged the cash and securities in Your Investment Account to an Affiliated Lender or bank as collateral for a Loan pursuant to the terms of a Loan Agreement or to Company as collateral for a Cash Advance, You will not be permitted to terminate Your Investment Account and will be permitted to withdraw only such amounts that would result in Your Investment Account maintaining a balance which equals or exceeds Your outstanding loan balance. The Minimum Balance still applies.

47. This Catch-22 ensnares borrowers and prevents them from exercising the ostensible right to reject changes in the agreement.

### LIMITATION OF LIABILITY

48. MoneyLion's contract purports to disclaim liability for a broad swath of damages to which Mr. Corpening and the class are entitled under North Carolina law.

49. For example, given the ubiquity of data breach incidents, MoneyLion's Membership Program and Services Agreement Terms and Conditions disclaim any

liability for such a breach:

> Security of Your Access Information. Except as otherwise expressly stated in these Terms or required by applicable law, Company is not responsible for any losses arising out of the loss or theft of Your access credentials, or Your mobile device or from unauthorized or fraudulent transactions associated with Your ML Checking Account.

50.     And it broadly limits liability across the board as well.

> **LIMITATION ON LIABILITY.** IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE TO FOR ANY LOST PROFITS OR SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF INFORMED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHERMORE, WE MAKE NO REPRESENTATION OR WARRANTY TO YOU REGARDING THE EFFECT THAT THE AGREEMENT MAY HAVE UPON YOUR FOREIGN, FEDERAL, STATE OR LOCAL TAX LIABILITY.

**MoneyLion's Arbitration Provision Is Unenforceable Because It Is Contained in A Void Contract**

51.     MoneyLion's Membership Agreement purports to have customers waive

their rights to sue or participate in a class action:

> **ARBITRATION. YOU WILL E-SIGN AN ARBITRATION AND CLASS ACTION WAIVER THAT PRECLUDES YOU FROM BRINGING A LAWSUIT IN COURT OR PARTICIPATE IN A CLASS ACTION.** Before signing this Agreement, you should carefully review the Agreements Resolving Disputes and Arbitration, separately E-Signed by you, and are incorporated here by reference as if fully set forth ("Dispute Agreements").
>
> Those Dispute Agreements provide that all claims arising from or relating to this Membership Agreement must be resolved by binding arbitration if the person or entity against whom a claim is made elects to arbitrate the claim. Thus, if the person or entity against whom the claim is made elects to

arbitrate the claim, then you will not have the following important rights:

You may not file or maintain a lawsuit in any court except a small claims court.

You give up your right to have a jury decide your claim. You will not be afforded the procedural, pre-trial discovery, and appellate rights in an arbitration proceeding that you would enjoy in a court or judicial proceeding.

You may not join or participate in a class action, act as a class representative or a private attorney general, or consolidate your claim with the claims of others.

You will have to pay certain fees in order to commence an arbitration proceeding, unless you ask us to pay those fees for you.

If you do not want to arbitrate all claims as provided in the Dispute Agreements, then you have the right to reject the Arbitration Agreement by delivering a written notice as provided in those agreements within thirty (30) days following the date of this Membership Agreement.

52.     But N.C.G.S. § 53-166(d) is clear and unambiguous: contracts in violation of its provisions "shall be void."

53.      Under North Carolina law, "[a] void contract is no contract at all; it binds no one and is a mere nullity." *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 270, 162 S.E.2d 507, 511 (1968) (quoting Am. Jur. 2d Contracts, § 7). The term "void contract" is a misnomer, "for '[i]f an agreement is void, it cannot be a contract." 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 1:20, at 49 (4th ed. 1990)).

54.     Because an agreement that is illegal and void does not exist, no part of it can be carried out, as no party should be permitted to benefit from an illegal act. *Lamm*

*v. Crumpler*, 242 N.C. 438, 442, 88 S.E. 2d 83, 86 (1955).

### Utah Law Should Not Apply To North Carolina Consumers

55.    MoneyLion's Membership Terms of Use also purport to have him waive his rights to the protections of North Carolina law, instead being subject to the laws of Utah:

> **Choice of Law.** The provisions of this Agreement will be governed by federal laws and the laws of the state of Utah to the extent not preempted, without regard to any principle of conflicts of laws that would require or permit the application of the laws of any other jurisdiction. The unenforceability of any provision of this Agreement shall not affect the enforceability or validity of any other provision of this Agreement.

56.    For the same reasons outlined in the foregoing paragraphs, this choice of law provision is unenforceable.

### MoneyLion's Unfair, Deceptive And Unconscionable Contract Provisions Are Also Unenforceable Because They Violate North Carolina Law And Public Policy

57.    These unfair, deceptive and unconscionable contract provisions, including the governing law and arbitration provisions, contain form language included in all loan agreements involving MoneyLion loans.

58.    MoneyLion's unilateral right to alter the contract makes the contract illusory.

59.    MoneyLion's limitation of liability and choice-of-law provisions are unenforceable as a matter of North Carolina law because they purport to disclaim the application of state law.

60.     MoneyLion voluntarily chose to do business with consumers in North Carolina, and under the applicable statutory and precedential case law. North Carolina law applies because, *e.g.*: the last act necessary to formation of the MoneyLion Loan agreements with Plaintiff and the Class was in North Carolina where the consumer signature occurred; the extension of credit is deemed to have been made in North Carolina by offering or agreeing in North Carolina to lend to a borrower who is a resident of the State, and additionally by the borrower accepting and being offered the loan in the State, "regardless of the situs of the contract as specified therein" (N.C. Gen. Stat. § 24-2.1); contracts made in a foreign State or country with the intent and purpose to evade the usury laws of North Carolina are invalid; and enforcement of the choice of law provision would "violate a fundamental policy" of North Carolina law prohibiting usury; loan agreements cannot seek to waive federal statutory rights.

61.     Through the unconscionable provisions described above MoneyLion seeks to deprive borrowers of any just and cost-effective means of seeking redress for its wrongful acts.

62.     In essence. MoneyLion seeks to use these unconscionable provisions to convert the terms of the MoneyLion Loan agreement into "a choice of no law clause," making it invalid and unenforceable. *Hayes v. Delbert Sews. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

## D.  Payday Loans and Similar Loan Arrangements Are Unlawful In North Carolina

63.     Like many states, North Carolina prohibits payday loans and similar

predatory loan arrangements.

64.    On October 1,1997, the North Carolina General Assembly passed the North Carolina Check Cashing Act ("NCCCA"). N.C. Gen. Stat. § 53-276. This Act permitted payday loans in North Carolina but required that they be no more than $300 including fees, contain a maturity date not more than thirty-one days after the loan was issued, and required that the total fees not exceed 15% of the face value of the check. N.C. Gen. Stat. § 53-281 (b-d). Furthermore, the NCCCA required that all payday lenders be licensed by the state of North Carolina as check cashers. *Id.*

65.    The NCCCA contained a "sunset date" of July 31, 2001. *In re Advance Am., Cash Advance Centers of N.C., Inc.,* No. 05:008:CF, 7 (Comm'r of Banks, Dec. 22, 2005). The North Carolina General assembly extended this date until August 31, 2001, and the NCCCA was allowed to expire on August 31, 2001. *Id.*

66.    The NCCCA expiration on August 31, 2001, however, did not put an end to the payday lending industry in North Carolina. While some payday lenders ceased operations, others merely masked their schemes by employing designs that *resembled* "payday lending" practices, but did not fit the traditional definition, such as providing limited information, in exchange for immediate cash payment, which the consumer must pay plus periodic accrued payments at usurious rates over a period of time. *State ex rel. Cooper v. NCC5 Loans, Inc.,* 174 N.C. App. 630, 635-36, 624 S.E.2d 371, 375 (2005).

67.    One "[f]ormer payday lender operated an Internet service 'rebate' scheme where customers received an instant cash 'rebate' that had to be repaid through a long-term Internet contract." *Id.* at 374. The courts looked at this transaction and determined

it was essentially a guise for a payday lending business and held that it violated North Carolina usury laws (N.C. Gen. Stat. § 24-1.1), the North Carolina Consumer Finance Act (N.C. Gen. Stat. § 53-166), and the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1). *State ex rel. Cooper v. NCCS Loans, Inc.* 624 S.E.2d at 375, 376.

68.     After the holding in *State ex rel. Cooper v. bICCS Loans, Inc.,* North Carolina courts continued their crackdown of these type of lending practices, holding that various payday lending schemes similarly violated North Carolina's usury statute, its Consumer Finance Act, and that payday lending in North Carolina constitutes unfair and deceptive trade practices. *See, e.g., Odell v. Legal Bucks, LLC,* 665 S.E.2d 767, 781,192 N.C. App. 298, 320 (N.C. App. 2008) (cash advance lender was not licensed, and the transaction was akin to a payday loan that violated the CFA and was not disclosed as violating the CFA, so it was a deceptive trade practice); *Gunnings v. Internet Cash Enterprise of Asheville, LLC,* 2007 WL1931291, at *6 (W.D.N.C. 2007) (individuals who ran a cash advance entity that contended to be a payday lender could be held liable for deceptive trade practices individually as controlling an entity engaged in payday lending); *Dillon v. BMO Harris Bank,* N. A., 16 F.Supp.3d 605, 620 (M.D.N.C. 2014) (North Carolina chartered-banks and nationally-chartered banks exempt under CFA, but subject to deceptive trade practice act).

69.     Ten years after the clear prohibition against payday loans and similar predatory lending practices in North Carolina, the North Carolina Attorney General sought to further curb the practice by bringing an action against a Native American

Tribe who claimed to be immune from liability. The North Carolina business court held tribal sovereign immunity did not insulate the tribe from being held liable under the applicable usury laws, the Consumer Finance Act, or the Unfair & Deceptive Trade Practice Act. *State ex rel. Cooper v. Western Sky Financial*, LLC, 2015 WL 5091229, at *10 (N.C. Super. 2015).

## CLASS ACTION ALLEGATIONS

70.     Mr. Corpening brings this action under North Carolina Rule of Civil Procedure 23 on behalf of the following Class of persons (the "Class"), subject to modification after discovery and case development:

> All persons: (1) who executed a loan of $25,000 or less with MoneyLion, (2) at an annual interest rate of more than 16% per annum, (3) when they resided or had an address in North Carolina, (4) from January 1, 2013 when MoneyLion began operations through the date class notice is disseminated.

71.     **Numerosity.** Upon information and belief, Class members are so numerous that joinder is impractical, likely numbering in the thousands. The names and addresses of the Class members are identifiable through the internal business records maintained by Defendants, and the Class members may be notified of the pendency of this action by email, published, and/or mailed notice.

72.     **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common questions include, as to the Class:

(a)     Whether MoneyLion made usurious loans to North Carolinians by charging more than 16% APR for loans of $25,000 or less;

(b)    Whether MoneyLion's loans in North Carolina constitute illegal "payday loans" under state law;

(c)    Whether MoneyLion's acts and/or practices in the conduct of commerce were unfair and/or deceptive;

(d)    Whether MoneyLion retained an unjust benefit because the loans were void;

(e)    Whether the choice-of-law, dispute resolution, and class action waiver provisions in the standard MoneyLion agreements violated North Carolina law, offended public policy interests, and should be deemed unenforceable;

(f)    Whether the failure to obtain the requisite license rendered MoneyLion's contracts in North Carolina void and/or unenforceable;

(g)    Whether MoneyLion violated the Truth in Lending Act through disclosure of a materially inaccurate interest rate and finance charge not permitted by law;

(h)    Whether MoneyLion's debt collection on the unlawful loans violated the Fair Debt Collection Practices Act;

(i)    What the proper recovery is for Plaintiff and the Class members against the MoneyLion Defendants.

73.    **Typicality.** Plaintiff's claims are typical of the claims of each Class member. Plaintiff is entitled to relief under the same causes of action as the other members of the Class. All are based on the same material facts and legal theories.

74.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests coincide with, and are not antagonistic to, the interests of the members of the Class he seeks to represent; and he has prosecuted and intends to continue to prosecute the action vigorously. He has retained counsel competent and experienced in such litigation, including illegal debt collection and lending law class actions in state and federal court. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiff nor his counsel have

interests which might cause them not to vigorously pursue this action.

75.    **Superiority.** A class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

## CAUSES OF ACTION
### COUNT I - VIOLATION OF NORTH CAROLINA CONSUMER FINANCE ACT
### N.C. GEN. ST AT. § 53-164, *et seq*.

76.    The North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-166(a), requires that any person engaged in the business of lending cannot "directly or indirectly" contract for or receive consideration greater than that allowed by Chapter 24 without being licensed by the Commissioner of Banks as a consumer finance lender. Specifically, N.C. Gen. Stat. § 53-166(a) provides, in pertinent part:

> No person shall engage in the business of lending in amounts of fifteen
> thousand dollars ($15,000) or less and contract for, exact, or receive, directly or
> indirectly, on or in connection with any such loan, any charges whether for

interest, compensation, consideration, or expense, or any other purpose whatsoever, which in the aggregate are greater than permitted by Chapter 24 of the General Statutes, except as provided in and authorized by this Article, and without first having obtained a license from the Commissioner.

77.    The maximum rate allowed by Chapter 24, N.C. Gen. Stat. § 24-1.1, on loans of $25,000 or less, is 16% per annum.

78.    The North Carolina Consumer Finance Act provides an exception to the 16% cap on interest rates set forth by Chapter 24, and allows consumer finance lenders licensed by the Commissioner of Banks to make consumer loans of up to $15,000 at interest rates permitted by the Act.

79.    For licensed loans made on or after July 1, 2013, pursuant to N.C. Gen. Stat. § 53-176, the maximum interest rate that may be charged for consumer loans in North Carolina under the Act is 30% per annum.

80.    MoneyLion has engaged in the business of lending and is therefore subject to the provisions of the Consumer Finance Act, including N.C. Gen. Stat. § 53-166. Upon information and belief, it is not licensed as a consumer finance lender by the Commissioner of Banks and has never been so licensed.

81.    MoneyLion has regularly made consumer loans to North Carolina borrowers at rates of approximately 121.5%, far in excess of the allowable limits in the Consumer Finance Act, which can be seen on the face of each loan contract, and which it has done knowingly, recklessly, and with intent.

82.    Through Plaintiffs and the Class's MoneyLion agreements, there was an understanding that money owed would be paid, an agreement to pay interest at a rate greater than allowed by law, and MoneyLion had corrupt intent to receive more in

interest than the legal rate permits for use of the money loaned in North Carolina.

83.     As an unlicensed lender, MoneyLion charged a rate of interest on a small loan to Plaintiff and the Class greater than the rates permitted, and would have exceeded the maximum APR even had it been properly licensed.

84.     Pursuant to N.C. Gen. Stat. § 53-166(d), all loans from MoneyLion made to North Carolina borrowers in violation of the Consumer Finance Act and held or collected on by the Defendants or any of their affiliates are void. MoneyLion is expressly prohibited under the Act from collecting, receiving, or retaining any principal or charges made or collected on by Defendants from North Carolina borrowers.

85.     Pursuant to N.C. Gen. Stat. § 53-190(a), all such loans made to North Carolina borrowers in violation of the North Carolina Consumer Finance Act are unenforceable in North Carolina. N.C. Gen. Stat. § 53-190(a) provides:

> No loan contract made outside this State in the amount or of the value of ten thousand dollars ($10,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

86.     MoneyLion's loans are therefore unenforceable pursuant to N.C. Gen. Stat. § 53-190(a) because the following contractual activities, among others, undisputedly occur in North Carolina:

    a.      Soliciting North Carolina resident borrowers through the Internet, and other means which have targeted and reached North Carolina borrowers in

their homes;

b.     Discussing with North Carolina resident borrowers the loans over the Internet or by telephone with borrowers in their homes or while such borrowers were located in North Carolina;

c.     Transmitting the loan documents to North Carolina resident borrowers while the borrowers were located in North Carolina;

d.     Executing the electronic signatures of the loan documents through the North Carolina borrowers' computers located in the borrowers' homes or elsewhere in North Carolina purportedly after their review of the contracts in North Carolina;

e.     Disbursing loan funds to North Carolina borrowers and borrowers' banks and bank accounts located in North Carolina;

f.     Incurring incidental costs, such as bank fees associated with the loans in North Carolina; and

g.     Receiving loan payments from North Carolina borrowers from funds in borrowers' bank accounts located in North Carolina.

87.     Further, N.C. Gen. Stat. § 53-180(g) prohibits deceptive acts or practices both with regard to the making of loans and collecting or attempting to collect money alleged to be due under loans subject to the Act.

88.     Accordingly, MoneyLion's activities are prohibited by the North Carolina Consumer Finance Act. Plaintiff and the Class seek a declaration that the MoneyLion agreements violate the North Carolina Consumer Finance Act and are illegal, void, and unenforceable; forgiveness of debt; forfeiture of interest owed and/or paid; recovery of double damages pursuant to N.C. Gen. Stat. § 24-2 for all usurious interest; injunctive relief prohibiting Defendants from offering or making any consumer loans to North Carolina borrowers in violation of the North Carolina Consumer Finance Act and from collecting on or retaining any principal or charges collected from North Carolina borrowers on such loans; and all other recovery

permitted by law.

## COUNT II - VIOLATION OF NORTH CAROLINA USURY STATUTE
## NORTH CAROLINA GENERAL STATUTES CHAPTER 24

89.     By the same conduct, Defendants have similarly violated North

Carolina's Chapter 24 prohibitions on usury. *Odell v. Legal Bucks,* LLC, 192 N.C. App.

298, 317, 665 S.E.2d 767, 779-80 (2008) ("For an unlicensed lender to charge a rate of

interest on a small loan greater than the rates permitted is a violation both of the

Consumer Finance Act, and of Chapter 24's prohibitions on usury.").

90.     North Carolina usury laws instruct that the protection of North Carolina

borrowers from illegal, usurious loans is a "paramount public policy" of the State, as

N.C. Gen. Stat. § 24-2.1 (g) mandates: "It is the paramount public policy of North

Carolina to protect North Carolina resident borrowers through the application of

North Carolina interest laws."

91.     North Carolina usury law, N.C. Gen. Stat. § 24-1.1, provides that the

maximum interest rate that may be charged on loans of $25,000 or less is 16% per

annum.

92.     North Carolina's usury laws mandate that they are to be applied to

protect North Carolina resident borrowers, "regardless of the situs of the contract," as

N.C. Gen. Stat. § 24-2.1 (a) and (b) provide:

> a.      For purposes of this Chapter, any extension of credit shall be deemed to
> have been made in this State, and therefore subject to the provisions of this
> Chapter if the lender offers or agrees in this State to lend to a borrower who is a
> resident of this state, or if such borrower accepts or makes the offer in this State

to borrow, regardless of the situs of the contract as specified therein.

b. Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

93. MoneyLion's consumer loans to North Carolina borrowers, including Plaintiff and the Class, are usurious because the rates and charges of such loans, approximately 121.5% when all required payments are taken into account, grossly exceed the rates and charges permitted by North Carolina usury law, which is evident from the face of the loan contracts, and which Defendants has done knowingly, recklessly, and with intent.

94. Through Plaintiff's and the Class's MoneyLion agreements, there was an understanding that money owed would be paid, an agreement to pay interest at a rate greater than allowed by law, and MoneyLion had corrupt intent to receive more in interest than the legal rate permits for use of the money loaned in North Carolina.

95. As an unlicensed lender, MoneyLion charged a rate of interest on a small loan to Plaintiff and the Class of approximately 121.5%, greater than the rates permitted, and would have exceeded the maximum APR even had it been properly licensed.

96. Plaintiff and the Class seek a declaration that the MoneyLion agreements violate the North Carolina Chapter 24 usury statute and are illegal, void, and unenforceable; forgiveness of debt; forfeiture of interest owed and/or paid; recovery of double damages pursuant to N.C. Gen. Stat. § 24-2 for all usurious interest; injunctive relief prohibiting Defendants from offering or making any consumer loans to North

Carolina borrowers in violation of the North Carolina Chapter 24 usury statute and from collecting on or retaining any principal or charges collected from North Carolina borrowers on such loans; and all other recovery permitted by law.

## COUNT III - VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT N.C. GEN. STAT. § 75-1.1

97.     Defendants engaged in "commerce" as defined by N.C. Gen. Stat. § 75-1.1, through the lending enterprise as described in this Complaint, including the operation to solicit, advertise, and contract with North Carolina consumers like Plaintiff and the Class with respect to the MoneyLion agreements in a predatory, usurious manner while claiming complete immunity for their actions, and the hiring of True Accord to attempt to collect and collect on the unlawful debts not owed and in a harassing manner, which it did so knowingly.

98.     The North Carolina UDTPA prohibits any "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. N.C. Gen. Stat. § 75-1.1.

99.     "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and a "practice is deceptive if it has the capacity or tendency to deceive." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393,399 (2007) (citation and quotation marks omitted).

100.    Courts in North Carolina have held that failure to inform a consumer that the loan documents were being executed in violation of North Carolina's Consumer

Finance Act or other laws can serve as a deceptive practice under the NC UDTPA. *See Odell v. Legal Bucks,* LLC, 192 N.C. App. 298, 319-20, 665 S.E.2d 767, 780-81 (2008).

101.     Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive trade practices" and that "it is a paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." *Id.* (citing N.C. Gen. Stat. § 24-2.1).

102.     Defendants' illegal MoneyLion contracts and collection efforts on those loans, had the capacity to deceive and did deceive Plaintiff and the Class into believing they had to pay on debts not in fact legally owed.

103.     In the course of offering, arranging, making and collecting on their illegal consumer loans, Defendants engaged in unfair and deceptive acts or practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

104.     Defendants' unfair and deceptive acts or practices include, but are not limited to, the following:

    a.     Engaging in an unfair business enterprise of offering, making, and collecting on consumer loans to North Carolina borrowers, when such loans are in gross violation of the usury laws of this State and violate the public policy of this State;

    b.     Continuing to offer, make, and collect on consumer loans in willful violation of North Carolina law, despite being aware that such loans are in violation of North Carolina law;

    c.     Making and collecting on loans at oppressive and unfair rates, and making such loans without accounting for the borrower's ability to repay;

    d.     Taking advantage of consumers in claiming and collecting amounts not owed;

e.    Attempting to circumvent North Carolina lending and consumer protection laws by deceptively asserting that such loans are made by an Indian tribe and are not subject to North Carolina lending laws, despite the fact that they cannot evade state and federal lending and collections laws.

105.    Defendants never informed Plaintiff or the Class that the loans were illegal under North Carolina usury, consumer finance, and other state and federal laws.

106.    As a result of Defendants' UDPTA violations, Plaintiff and the Class suffered substantial damage, including but not limited to financial damage incurred from payments and/or other expenses associated with the illegal loans.

107.    Plaintiff and the Class seek compensatory damages, statutory damages, including up to treble damages, attorneys' fees and costs, injunctive relief to restrain Defendants from further violations of N.C. Gen. Stat. § 75-1.1, as well as all other relief which may be due and owing under the Act. *E.g.*, N.C. Gen. Stat. §§ 75-16, 75-16.1, 75-19.

## COUNT IV - VIOLATION OF NORTH CAROLINA DEBT COLLECTION ACT N.C. GEN. STAT. §§ 75-54, 75-55

108.    Plaintiff and the Class are "consumers" as defined by N.C. Gen. Stat. § 75-50(1) when they entered into the Money Lion agreements.

109.    Defendants are "debt collectors" as defined by N.C. Gen. Stat. § 75-50(3) as "any person engaging, directly or indirectly, in debt collection from a consumer." MoneyLion collected the debts from Plaintiff and the Class on the MoneyLion agreements.

110.    Defendants falsely represented the character, extent, or amount of a debt against a consumer under N.C. Gen. Stat. § 75-54, when it attempted to collect or collected on the illegal MoneyLion agreements not owed under North Carolina law

from Plaintiff and the Class.

111. Defendants collected or attempted to collect from consumers, including Plaintiff and the Class, interest or other charge, fee or expense incidental to the principal debt not legally owed, due to the illegality of the usurious MoneyLion agreements under North Carolina law. N.C. Gen. Stat. § 75-55.

112. As a result of Defendants' NCDCA violations, Plaintiff and the Class suffered substantial damage, including but not limited to financial damage incurred from Defendants' illegal loan agreements.

113. Plaintiff and the Class seek compensatory damages, statutory damages, as well as all other relief which may be due and owing under the Act. E.g., N.C. Gen. Stat. § 75-56.

## COUNT V - VIOLATION OF TRUTH IN LENDING ACT
### 15 U.S.C. § 1601, *et seq.*

114. The Truth In Lending Act ("TILA") requires creditors to provide accurate disclosure to consumer borrowers, including the finance charge and annual percentage rate for every loan, 12 C.F.R. § 1026.18.

115. The disclosure must be based on the actual "legal obligation" of the borrower, 12 C.F.R. § 1026.17(c)(1), so the disclosure of a usurious rate of interest and amount due based on it is not accurate of the obligation legally required and violates the act.

116. Money Lion disclosed the interest rate of 5.99% APR to Plaintiff even though the actual interest rate was approximately 121.5%, far in excess of the disclosed

APR and in fact exceeded the 16% usury ceiling for unlicensed lenders.

117.    Money Lion failed to disclose any aspect of its $29 monthly "membership fee" as a finance charge, although it was imposed as "an incident to or a condition of the extension of credit. Regulation Z, 12 C.F.R. § 1026.4(a).

118.     These inaccurate disclosures hid the true, usurious interest rate on the loans.

119.    These inaccurate disclosures also misrepresented the Plaintiff's and Class members' actual legal obligation under North Carolina law.

120.    The disclosure of an annual percentage rate in excess of the actual legally enforceable rate violates TILA. 12 C.F.R. § 1026.22(a)(2) ("As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of 1 percentage point above or below the annual percentage" rate correctly determined).

121.    Defendants participated directly in the dissemination of inaccurate, miscalculated TILA disclosures. Money Lion determined the hidden, illegal annual percentage rate and finance charge, and it supervised the dissemination of these inaccurate disclosures in the loan agreements with North Carolina borrowers, including Plaintiff and the Class.

122.    Plaintiff and the Class made payments associated with the illegal loans set at usurious rates based on the false information in their MoneyLion agreements.

123.    MoneyLion of North Carolina is a creditor as defined by TILA.

124.    Plaintiff and the Class are entitled to actual and statutory damages, fees and costs, and all other relief allowed by law under TILA. 15 U.S.C. § 1640(a).

## COUNT VI - UNJUST ENRICHMENT

125.    Plaintiff's and the Class's MoneyLion loans were void and illegal when made.

126.    Plaintiff and Class members conferred a measurable benefit on the Defendants when they entered into usurious loan agreements with MoneyLion which knowingly and voluntarily entered into the predatory and usurious loan agreements affording it large and unlawful gains on its loans.

127.    Defendants were unjustly enriched by knowingly and voluntarily accepting the benefit therefrom, which Plaintiff and the Class did not give gratuitously or officiously.

128.    The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

129.    Accordingly, Plaintiff and the Class seek to recover from Defendants, jointly and severally, all ill-gotten gains, including forgiveness of debt purportedly owed on the illegal loan agreements and any payments paid thereon, and any profits received in connection with collection or attempted collection of the debts on the illegal loan agreements with Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of himself and the Class he seeks to represent against Defendants as follows:

a. Plaintiff and all class members be awarded actual damages, including but not limited to forgiveness of all debt not legally owed;

b. Plaintiff and all Class members be awarded statutory damages;

c. Plaintiff and all Class members be awarded treble damages;

d. Plaintiff and all Class members be awarded costs and attorneys'fees;

e. Defendants be disgorged of all ill-gotten gains associated with the MoneyLion agreements;

f. An order that Defendants and their agents, or anyone acting on their behalf, be enjoined from the unlawful conduct, including advertising, soliciting, and entering into any new loan contracts at usurious rates in North Carolina, collecting payments on existing usurious loan contracts in North Carolina, reports of missed or late payments to reporting agencies on the loans, as well as from altering, deleting or destroying any documents or records that could be used to identify Class members;

g. An order declaring that the Money Lion contracts in North Carolina violate North Carolina and federal law and are void and unenforceable;

h. An order certifying Plaintiffs claims and all other persons similarly situated as class action claims under Rule 23 of the North Carolina Rules

of Civil Procedure, and appointment of the undersigned as class counsel; and

i.  Such other and further relief as the Court may deem just and proper.


Dated: September 17, 2019        Respectfully Submitted,

        /s/ *James L. Kauffman*
        John Roddy (pro hac vice to be filed)
        James L. Kauffman *pro hac vice*
        BAILEY GLASSER LLP
        1055 Thomas Jefferson Street NW, Suite 540
        Washington, D.C. 20007
        T: (202) 463-2101
        F: (202) 463-2103
        jkauffman@baileyglasser.com

        W. Stacy Miller II (N.C Bar No. 21198)
        MILLER LAW GROUP, PLLC
        555 Fayetteville St., Suite 201
        Raleigh, NC 27602
        T: (919) 348-4361
        F: (919) 729-2953
        Stacy@MillerLawGroupNC.com

        Benjamin M. Sheridan (N.C. Bar No. 52734)
        KLEIN & SHERIDAN, LC
        3566 Teays Valley Road Hurricane, WV 25526
        T: (304) 562-7111
        F: (304) 562-7115
        bsheridan@kswvlaw.com


        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2019, a true and correct copy of the

foregoing **AMENDED COMPLAINT** has been furnished to all counsel of record

through the Court's EM/ECF electronic case filing system.


_/s/ James L. Kauffman_____
James L. Kauffman